## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DERBERA ANN LEWIS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-1259 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

Pending before the court are Plaintiff Derbera Ann Lewis' (" Lewis") and Defendant Jo Anne B. Barnhart' s (" the Commissioner") cross-motions for summary judgment. Lewis appeals the determination of an Administrative Law Judge (" the ALJ") that she is not entitled to receive Title XVI supplemental security income (" SSI") benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Lewis' Motion for Summary Judgment (Docket Entry No. 18) should be denied, the Commissioner' s Motion for Summary Judgment (Docket Entry No. 22) should be granted, and that the Commissioner' s decision denying benefits be affirmed.

### I.      *Background*

Lewis filed an application for SSI benefits with the Social Security Administration (" SSA") on December 11, 2001, claiming that she had been disabled and unable to work since November 16, 2000. (R. 26, 66-68, 375). Lewis alleged that she suffers from chronic back pain, high blood

pressure (hypertension),[1] diabetes,[2] high cholesterol, headaches, problems with her feet and legs, and depression.  (R. 27, 77).  After being denied benefits initially and on reconsideration (R. 39-44, 50-52), Lewis requested an administrative hearing before an ALJ to review the decision.  (R. 53)

A hearing was held on December 4, 2002, in Bellaire, Texas, at which time the ALJ heard testimony from Lewis, Hubert Stuart, M.D. (" Dr. Stuart"), a medical expert, and Pamela K. Lewis, Ph.D. (" Dr. Lewis"), a vocational expert (" VE").  (R. 58, 61, 357-385).  In a decision dated December 13, 2002, the ALJ denied Lewis' application for benefits.  (R. 26-36).  On December 17, 2002, Lewis appealed the ALJ' s decision to the Appeals Council of the SSA' s Office of Hearings and Appeals.  (R. 21).  The Appeals Council, on February 11, 2005, denied Lewis' request to review the ALJ' s determination.  (R. 4-6).  This rendered the ALJ' s opinion the final decision of the Commissioner.  *See Sims v. Apfel,* 530 U.S. 103, 107 (2000).  Lewis filed this case on April 12, 2005, seeking judicial review of the Commissioner' s denial of her claim for benefits.  *See* Docket Entry No. 1.

## II.    *Analysis*

### A.     *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001).

---

[1]  "Hypertension" refers to  high arterial blood pressure.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 858 (29th ed. 2000).

[2]  "Diabetes mellitus" refers to a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance.  It occurs in two major forms: type 1 diabetes mellitus and type 2 diabetes mellitus, which differ in etiology, pathology, genetics, age of onset, and treatment.  *See* DORLAND'S, *supra*, at 489.

2

The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of *indigence* and *disability*.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).   A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an  application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, January 2002, fixes the earliest date from which benefits can be paid.  (R. 47-49).  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Applicants seeking benefits must prove " disability" within the meaning of the Act, which defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).

**B.**     ***Standard of Review***

**1.**     ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material

3

fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

## 2.    *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough

to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson*, 309 F.3d at 272.

C.     ***ALJ's Determination***

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 416.920(b).

2.     An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 416.920(c).

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 416.920(d).

4.     If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* C.F.R. § 416.920(e).

5

5.      If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705. The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

6

to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  " Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 416.972.

A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.' " *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (quoting 42 U.S.C. § 423(d)(3)).  " [A]n individual is 'under a disability, only if [her] impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' " *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps the ALJ determined:

1.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability

2.    The medical record demonstrates that the claimant has the following severe medically determinable impairments: depression, hypertension, diabetes mellitus, and chronic back pain.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals in severity the medical criteria of any impairment found in Appendix 1, subpart P, Regulations No. 4.

4.      The undersigned finds that claimant's testimony regarding her subjective symptoms and limitations are not fully credible but exaggerated.

5.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. § 416.927).

6.      The claimant has the residual functional capacity to perform a sedentary level of work.  She has a good ability to follow work rules, relate to co-workers, deal with the public, use judgment, cooperate with supervisor(s), maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  She has fair ability to function independently, maintain attention and concentration, and understand, remember, and carry out simple job instructions.  Further, she has a poor ability to deal with work pressures and to understand, remember, and carry out detailed and complex job instructions.

7.      The claimant is unable to perform any of her past relevant work (20 C.F.R. § 416.965).

(R. 35).  As to the fifth step, the ALJ concluded:

8.      The claimant is 44 years of age defined as a "younger individual" (20 C.F.R. § 416.963).

9.      The claimant has a "high school equivalent education" (20 C.F.R. § 416.964).

10.     The claimant has no transferable skills from any past relevant work within her residual functional capacity (20 C.F.R. § 416.968).

11.     The claimant has the residual functional capacity to perform significant range of sedentary, unskilled work (20 C.F.R. § 416.967).

12.     Based on testimony of the vocational expert and using Rule 201.28, Appendix 2, Subpart P, Regulations No. 4, as a framework for decision-making, jobs that the claimant is able to perform exist in significant numbers in the national economy.

8

13.     The claimant was not under a " disability," as defined in the Social Security
        Act, at any time through the date of this decision (20 C.F.R. § 416.920(f)).

(R. 36).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Lewis' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ, and not the Court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D.     *Issues Presented*

Lewis contends that the ALJ committed error at step three of the evaluation process by failing to find that Lewis met or equaled Listing 12.05C (*i.e.*, mental retardation) because the ALJ failed to recognize the IQ score extrapolated from the Shipley Institute of Living Scale (" Shipley") test.  Lewis also argues that the ALJ erred in rejecting the findings and opinion of a consultive psychiatric evaluation.  Lewis further asserts that the ALJ erred in failing to make specific findings

about the nature of claimants stress, the circumstances that trigger it, and how those factors affect her ability to do work. *See* Docket Entry No. 18, at 7. The Commissioner disagrees with Lewis' contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 23.

      **E.**    ***Review of the ALJ's Decision***

            **1.**    ***Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. § 416.926(a).  The applicable regulation further provides:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> > (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
> >
> > (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

11

      (ii)     We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 416.926(a). Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. § 416.927(e).

A review of the medical records submitted in connection with Lewis' administrative hearing reveals a history of treatment for hypertension dating back to January 30, 1999. (R. 327). Lewis' blood pressure was documented as typically being in the range of 140-170 over 90-96. (R. 120, 121, 235, 236, 238, 244, 255, 256, 262, 265, 268, 322, 333, 351). Higher blood pressure was recorded in January 1999, July 1999, February 2001, June 2001, and August 2002. (R. 120, 313, 327, 336, 339). Blood pressure readings below her typical range were recorded in September, October and November of 2001, and April, May, and August of 2002. (R. 250, 252, 253, 295, 298, 299, 301, 345, 348, 349, 350).

In June 2000, Lewis had knee surgery to repair a left meniscal tear. (R. 309-310). With regard to her back, the records indicate that in November 2000, while working in the food court section of Garden Ridge Pottery, Lewis allegedly injured her back while lifting a 35-pound bag of grease for use in a deep fryer. (R. 185-186, 216, 229, 272). Initially, Lewis was treated by Scott Bischoff, M.D. ("Dr. Bischoff"), who evaluated her and prescribed physical therapy modalities consisting of heat, cold packs, massage, and electrical stimulation. (R. 216). Lewis also was referred to Jeffrey B. Wood, M.D. ("Dr. Wood") for aggressive physical therapy. (R. 216, 229-231).

On December 13, 2000, Dr. Wood suggested that Lewis enter a work hardening program (*i.e.*, a daily program which incorporates strengthening as well as education).  (R. 229).  On March 2, 2001, Nilesh Bavishi, M.D. (" Dr. Bavishi") noted that Lewis' hypertension was much better controlled.  (R. 116).  On May 1, 2001, Dr. Wood examined Lewis and reported that Lewis had dropped out of the work hardening program, results from an MRI failed to demonstrate any evidence of significant abnormality, and her symptoms were well out-of-proportion to his objective findings.  (R. 226-227).

On July 2, 2001, Lewis entered a pain management program.  (R. 213, 227).  This program consisted of individual psychotherapy, group psychotherapy and physical rehabilitation.  Lewis attended the program for 18 days in July 2001 and 3 days in August 2001.  (R. 122-216).  Lewis' psychotherapy sessions were conducted by Rafael E. Sacasa, Ph.D. (" Dr. Sacasa") and Lawrence Katz, Ph.D. (" Dr. Katz").  Dr. Sacasa performed a psychological evaluation and pscyhophysiological profile assessment on Lewis on July 2, 2001.  (R. 216).  Dr. Sacasa reported that Lewis was experiencing moderate to severe psychological distress, manifested by excessive worrying, anxiety, tension, and some mild depression.  (R. 218).  Dr. Sacasa opined that Lewis was overly focused on her pain and evaluated Lewis with a global assessment of functioning (" GAF ") rating of 75.[3]  (R. 218-219).

---

[3] A GAF score represents a clinician' s judgment of an individual' s overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (" DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF scale, which is divided into ten ranges of functioning.  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  A GAF rating of 75 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (*e.g.*, difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (*e.g.*, temporarily falling behind in school work)."  *See id*. at 34.

On July 12, 2001, Wallace A. Stanfill, M.Ed., L.P.C. ("Stanfill"), a certified rehabilitation counselor, prepared an initial vocational rehabilitation group report, indicating that Lewis was receiving Workers' Compensation benefits and had recently undergone an independent medical examination with the doctor assigning a 5% impairment rating. (R. 185-186). Stanfill provided Lewis with additional information related to workers' compensation and social security disability issues. (R. 185).

During the pain management program, Lewis cancelled physical rehabilitation sessions five times in July and one time in August of 2001. (R. 132, 142, 153, 163, 165, 169, 202). Lewis completed physical rehabilitation without complaints of pain on three days in July and one day in August 2001. (R. 137, 141, 146, 173). Physical therapist Jose Carrillo performed a functional performance evaluation on Lewis on August 3, 2001. (R. 126-131). Lewis' ratings from the evaluation were predominantly good, some fair, and one poor rating in the sit and reach test. (R. 127-131). Lewis was discharged from physical rehabilitation, after reaching all of her goals, on August 3, 2001. (R. 122). During most group psychotherapy sessions, Lewis' mood was observed to be normal. (R. 124, 125, 134, 135, 138, 139, 143, 145, 150, 154, 155, 156, 157, 159, 160, 167, 168, 170, 171, 178, 180, 183, 189, 191, 193, 203, 205, 208, 209, 210, 211, 214, 215). On August 2, 2001, it was noted that Lewis was "emotionally in control." (R. 132). On August 7, 2001, Dr. Wood opined that Lewis had completed the pain management program and he anticipated that Lewis could return to some kind of work that did not require significant lifting. (R. 223).

Between August 2001 and September 2002, Lewis visited clinics and hospitals in the Harris County Hospital District numerous times for various reasons including to have her cholesterol and

blood chemistry checked, diabetes, vertigo, flu, diarrhea, and routine check up.  (R. 235, 236, 238, 244, 245, 248, 250, 251, 252, 253, 255, 256, 261, 262, 263, 268, 295, 298, 299, 301, 336, 343, 345, 348, 349, 351, 354).

On June 4, 2002, Kathy Scott-Gurnell, M.D. (" Dr. Scott-Gurnell") performed a psychiatric examination on Lewis, diagnosing Lewis with Major Depressive Disorder.  (R. 270-275).  According to Dr. Scott-Gurnell, Lewis was physically and emotionally too fragile to handle the stress of work.  (R. 274).   Dr. Scott-Gurnell evaluated Lewis with a GAF rating of 40.[4]  (R. 274).

On June 14, 2002, Lyman G. Phillips, M.D. (" Dr. Phillips") completed a Psychiatric Review Technique form, finding that Lewis did not meet the disability criteria under Listing 12.04, affective disorders.  (R. 276-289).   Dr. Phillips also completed a functional capacity assessment, finding that Lewis had a mild to moderate impairment of socialization/concentration.  (R. 290-293).  According to Dr. Phillips, Lewis retained the capacity to perform non-complex work with minimal public interaction.  (R. 292).  Dr. Phillips opined that Lewis' alleged severity of mental limitations was partially supported by the evidence of record.  (R. 292).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*,

---

[4]  A GAF rating of 40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See* DSM-IV-TR, *supra*, at 34.

219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist. *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211. It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

### a.    *Listing 12.05—Mental Retardation*

In the case at bar, Lewis argues that she met the requirements of Listing 12.05C[5] because she scored in the 1% percentile of the Shipley test.  Lewis further contends that the ALJ improperly rejected the results of the Shipley test.  Lewis also maintains that the ALJ should have sent Lewis for a consultative examination regarding her IQ.  *See* Docket Entry No. 18, at 8-19.  Contrary to Lewis' contentions, the record indicates that the ALJ correctly determined that Lewis had no impairment which met or equaled a listing, including Listing 12.05C.  Dr. Sacasa administered to Lewis the Shipley test in July 2001.  (R. 218).  Based on the Shipley test results, Dr. Sacasa extrapolated Lewis' full scale IQ as "66 +/-9." (R. 218).  Dr. Sacasa noted that these "results seem very low.  It appears that [Plaintiff] did not give much effort during testing."  (R. 218).

Additionally, the Shipley test is not expressly recognized by the Commissioner's regulations as a reliable method for determining IQ.  *See* 20 C.F.R. pt. 404, subpt. P, App. 1 § 12.00(D)(6).  The Social Security regulation allow ALJs to accept and use extrapolated results from other generally accepted tests under certain appropriate conditions.  *See id*.  Here, the ALJ correctly noted that the Shipley test result was only an estimate of Lewis' IQ and was not a definitive measure as to what her full scale IQ would be if she was actually administered the Wechsler Adult Intelligence Scale Revised ("WAIS-R").  (R. 30).  At the administrative hearing, the medical expert, Dr. Stuart, testified that the

---

[5] Listing 12.05. Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * *

C.    A valid verbal, performance, or full scale IQ of 60-70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*See* 20 C.F.R. pt. 404, subpt. P, App. 1 § 12.05.

Shipley test only provides a rough estimate of an IQ score, and that the Shipley test " is not a standard way to determine the IQ of an adult." (R. 30, 362).  Also, Dr. Sacasa reported that Lewis' test result seemed " very low." (R. 218).  As such, the ALJ appropriately rejected the Shipley test as a measure of Lewis' IQ.

Moreover, test results from the Shipley test and/or an IQ test alone are insufficient to indicate disabling mental retardation.  In order to be found disabled *per se* under 12.05C, Lewis must show a valid diagnosis of mental retardation or a " significant subaverage general intellectual functioning with deficits in adaptive behavior" manifested *before age 22*.  *See* 20 C.F.R. pt. 404, subpt. P, App. 1 § 12.05 (emphasis added).  Here, Lewis fails to meet the diagnostic criteria, as she has not shown evidence of mental retardation or a diagnosis of mental retardation before age 22.  Furthermore, Lewis does not argue that she has deficits in adaptive functioning[6] prior to age 22.

An additional consultative examination was not warranted because no records exist demonstrating that Lewis has been classified as mentally retarded.  In this regard, the ALJ noted that Lewis demonstrated that she has not functioned at the mentally retarded level of functioning. (R. 30).  In her disability report, Lewis reported that she attended regular education classes in school.  (R. 30, 83).  Lewis further reported that she dropped out of school in 11th grade due to pregnancy.  (R. 30, 271).  Lewis also completed a dental assistant course.  (R. 30, 271).  Lewis maintained her job at Garden Ridge Pottery for over five years.  (R. 78).  Lewis did not allege mental retardation in documents related to her administrative hearing.  (R. 21, 48, 53, 77, 104-

---

[6] "Adaptive functioning" is defined as how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in this particular age group, sociolcultural background, and community setting. *See* DSM-IV-TR, *supra*, at 42.

107, 108).  Finally, at the hearing, Lewis failed to articulate that mental retardation limited her ability to work or otherwise disabled her.  No physician, including Dr. Sacasa, has diagnosed Lewis as mentally retarded.   When, as here, a claimant makes no formal contention of mental retardation, isolated comments or treatment notations about the limits of a claimant's intellectual functioning are not sufficient to raise a suspicion of mental retardation.  *See Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989); *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987). Consequently, substantial evidence supports the ALJ's determination that Lewis was not mentally retarded.  (R. 30).

### b.   *Consultative Examiner's Opinion*

Lewis next argues that the ALJ improperly rejected the opinion of consultative examiner, Dr. Scott-Gurnell, who opined that Lewis "was too fragile to handle the stress of the work environment."  (R. 29-30, 32, 270-274).   Contrary to Lewis' assertion, the ALJ properly articulated his reasons for discounting Dr. Scott-Gurnell's opinion regarding Lewis' stress limitation.  (R. 29-32).  The ALJ noted that Dr. Scott-Gurnell's examination records contradicted her opinion that Lewis could not handle any work stress.  (R. 32).   Indeed, the ALJ noted that Dr. Scott-Gurnell's report noted that Lewis was able to perform her own household chores, as well as handle her own finances.  (R. 32, 273, 275).   Also, the ALJ noted that Dr. Scott-Gurnell observed Lewis to be fully oriented, cooperative, and engageable, but exhibited poor eye contact, he thought process was goal-directed and goal-oriented, and she was able to recall three out of three items immediately and after five minutes.  (R. 29, 272-273).  Dr. Scott-Gurnell further noted that, although Lewis' concentration was somewhat impaired and she was unable to complete the serial 3s, she was able to spell "WORLD" forward and backwards, and her judgment and ability

19

to abstract were intact.  Lewis' pace was assessed as slow but with good persistence.  (R. 30, 273).  Finally, the ALJ correctly noted that Dr. Scott-Gurnell did not have the benefit of reviewing the entire medical evidence contained in the record; whereas, the ALJ did review the complete record before making his determination that Lewis had a poor ability to deal with work stress and that she was *not* completely unable to deal with work stress as opined by Dr. Scott-Gurnell.  (R. 29-32, 34).

To the extent Lewis attempts to rely on the GAF score of 40 rendered by consultative examiner Dr. Scott-Gurnell in June 2002 as support of Dr. Scott-Gurnell's stress-limitation opinion, Lewis' reliance is misplaced.  As an initial matter, a GAF score is not an absolute determiner of an ability to work.  *See Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (consideration of GAF scores not essential to the accuracy of the residual functional capacity assessment).  Additionally, Dr. Sacasa opined in July 2001 that Lewis' GAF score was 75.  Although the ALJ did not specifically reference the GAF score of 40, the ALJ fully discussed and analyzed Dr. Scott-Gurnell's consultative evaluation, along with all of the evidence of record.  (R. 28-33).

Moreover, to the extent Lewis contends that the ALJ failed to comply with 20 C.F.R. § 404.1527(d) in analyzing Dr. Scott-Gurnell's stress-related opinion, this argument is specious.  The factors set forth in 20 C.F.R. § 404.1527(d) are not applicable in this instance because Dr. Scott-Gurnell is not a treating physician.  *See Newton*, 209 F.3d at 453-55 (requiring the ALJ to perform a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2) when there is an absence of reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist).  Dr. Scott-Gurnell was only

a consultative examiner.  Thus, the ALJ was not obligated to provide the detailed analysis required by *Newton*.

### 2.   *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.  *See Falco*, 27 F.3d at 163 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be " constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ' s discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

The ALJ' s decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Lewis' complaints:

> The claimant testified at the hearing that she was unable to work due to " hurting a lot."  She testified that her whole body hurts all of the time, including her legs, knees, feet, and back.  She further said that her left knee give out due to pain.
> * * *
> Despite the claimant' s allegations of constant pain in her left knee and giving out, the medical record documents that the claimant declined surgery in August 2002, which suggests that the pain is not as disabling as alleged (Exhibit 5F, page 11 and Exhibit 11 F, page 2).
> * * *

> The Administrative Law Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitation as found herein, and the claimant's subjective complaints are found not fully credible but exaggerated.

(R. 32, 34).   Based on a review of the entire record, the Court does not doubt that Lewis suffers from pain; however, the medical records do not support a finding that Lewis' pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  Lewis' physicians have encouraged her to exercise on a daily basis.  Progress notes dated October 23, 2001, reveal that Lewis was walking 20 minutes per day, twice per week.  (R. 33).   Additionally, when seen on September 2, 2002, it was recommended that Lewis walk 30 minutes per day.  (R. 33, 343).  Additionally, Lewis testified that she is able to cook, make her bed, put laundry in the washer, grocery shop once per month, and care for her 12-year-old son.  (R. 373).  Accordingly, there is substantial evidence that supports the conclusions of the Commissioner and the ALJ that Lewis'  subjective reports of pain do not rise to the level of disability.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

**3.**      ***Residual Functional Capacity***

Under the Act, a person is considered disabled:

> only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  If a claimant demonstrates that she cannot perform her past relevant work, the Commissioner bears the burden of proving that her functional capacity,

age, education, and work experience allow her to perform work in the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. Once the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey*, 230 F.3d at 135.

To determine whether an applicant can return to a former job or, if never employed, can perform substantial work in the national economy, the regulations require the ALJ to evaluate the applicant's residual functional capacity ("RFC"). *See Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983) (citing 20 C.F.R. §§ 404.1561, 416.961). This term of art merely designates the ability to work despite physical or mental impairments. *See id.*; *see also* 20 C.F.R. §§ 404.1545, 416.945. "Residual functional capacity" combines a medical assessment with the descriptions by physicians, the applicant or others of any limitations on the applicant's ability to work. *See id.* When a claimant's RFC is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See* 20 C.F.R. §§ 404.1561, 416.961. The testimony of a vocational expert is valuable in this regard, as "[she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey*, 230 F.3d at 145; *see also Masterson*, 309 F.3d at 273; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). In the absence of contrary evidence, the ALJ may properly rely on the testimony of a vocational expert in reaching a

conclusion regarding a claimant's RFC to perform work available in the national economy. *See Masterson*, 309 F.3d at 273.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the regulations, also referred to as the grids, without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act. *See Heckler v. Campbell*, 461 U.S. 458, 467, 470 (1983). As the Supreme Court explained in *Campbell*:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress–physical ability, age, education, and work experience–and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

461 U.S. at 461-62 (footnotes omitted). The Court elaborated:

> Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs–*i.e.*, whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 404.1567. Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects [she] must lift and whether extensive movement or use of arm and leg controls is required. *Ibid*.

*Id.* at 462 n.3.

Under the regulations, impairments can be either exertional or nonexertional. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs. *Id.* The classification of a limitation

as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *See id.*; *see also* 20 C.F.R. § 404.1569(a). All other impairments are classified as nonexertional. *See Sykes*, 228 F.3d at 263.

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR"). The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See Myers*, 238 F.3d at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)). In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and the interplay of exertional and nonexertional factors:

> First, SSR 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." "However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . ." RFC involves both exertional and nonexertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. "Each function must be considered separately." "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (quoting 61 Fed. Reg. 34474-01 (July 2, 1996)). The court also noted that SSR 96-9p defines exertional capacity as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can

meet the job's exertional and nonexertional requirements on a sustained basis and can maintain regular employment. *See Watson*, 288 F.3d at 218; *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986); *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform. *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)). Nevertheless, "use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity.'" *Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458. If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy. *See id.* Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC. *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

Here, Lewis suffers from exertional and nonexertional impairments (*i.e.*, mental impairments); thus, it was proper for the ALJ to rely on a vocational expert to establish that suitable jobs exist in the economy. *See Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at

199); *accord Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458.   In determining Lewis' residual functional capacity, the ALJ stated:

> Considering the claimant's history and treatment, the objective clinical findings, the claimant's subjective complaints, the observations and comments of her treating sources, the assessment of Dr. Scott-Gurnell and Dr. Sacasa, as evaluated above, the assessment of the State Agency reviewing physician, the testimony of the medical expert, and all of the evidence of record considered as a whole, it is concluded that the claimant is able to perform at least a sedentary level of work. Additionally, the claimant retains a good ability to follow work rules, relate to co-workers, deal with the public, use judgment, cooperate with supervisor(s), maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. She has a fair ability to function independently, maintain attention and concentration, and understand, remember, and carry out simple job instructions. Additionally, she has a poor ability to deal with work pressures and to understand, remember, and carry out complex and detailed job instructions.

(R. 34).   Because the VE classified Lewis' past relevant work as either medium and semi-skilled or medium and unskilled, the ALJ determined that she could not perform her past relevant work. (R. 34, 380-381).

Lewis alleges that the ALJ failed to make specific findings about the nature of Lewis' stress, the circumstances that trigger it, and how those factors affect her ability to work. *See* Docket Entry No. 18, at 23-25. Contrary to Lewis' contention, the ALJ included this limitation in his hypothetical question to the VE at the administrative hearing and, in his decision, found that Lewis had a poor ability to deal with stress. (R. 34-35, 381). Specifically, the ALJ determined that Lewis had a poor ability to deal with work pressures and understand, remember, and carry out complex and detailed job instructions. (R. 34). Thus, when questioning the VE, the ALJ added that Lewis needed "low pressure type of work." (R. 381). Thus, the ALJ clearly recognized and acknowledged that Lewis experience stress related to work, and the ALJ's

residual functional capacity limitations relating to stress properly accommodated this symptom. Additionally, in response to the ALJ's hypothetical question, which included the limitation for stress, the VE testified that Lewis could perform other work existing in the national economy. (R. 35, 381-382). Because the ALJ's hypothetical question to the VE included all of the limitations supported by the record, the VE's testimony is substantial evidence of a significant number of jobs Lewis can perform. *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

**III.**   ***Conclusion***

In sum, the record provides substantial evidence supporting the Commissioner's decision that Lewis is not disabled. Accordingly, it is therefore

**ORDERED** that Lewis' Motion for Summary Judgment (Docket Entry No. 18) is **DENIED**. It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 22) is **GRANTED**. It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**. Finally, it is

**ORDERED** that the matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas, on this the 26th day of September, 2006.

Calvin Botley
United States Magistrate Judge